Filed 8/9/16  In re L.R. CA4/1

### NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re L.R., a Person Coming Under the Juvenile Court Law. | |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | D069827 |
| Plaintiff and Respondent, | (Super. Ct. No. SJ0012933) |
| v. | |
| MELISSA M., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of San Diego County, Kenneth J. Medel, Judge.  Affirmed.

Cristina Gabrielidis, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel, and Dana C. Shoffner, Deputy County Counsel, for Plaintiff and Respondent.

Melissa M. appeals the juvenile court order terminating her parental rights to her minor son L.R. under Welfare and Institutions Code section 366.26.[1] Melissa contends the court erred by finding the beneficial parent-child relationship exception to adoption did not apply. We affirm the order.

FACTUAL AND PROCEDURAL BACKGROUND

In October 2013, the San Diego County Health and Human Services Agency (Agency) filed a petition under section 300 on behalf of one-year-old L.R. The Agency alleged that L.R. was at substantial risk of serious physical harm as a result of exposure to violence between Melissa, his father Hugo R.,[2] and his maternal grandfather Louis R.

At the time the petition was filed, the Agency was already involved with the family as a result of a June 2013 referral concerning L.R.'s brother, Michael R. At the time of that referral, six-month-old Michael, who was born with a congenital heart defect and other significant medical problems, had been recently discharged from the hospital but readmitted repeatedly because he was failing to thrive. The medical team treating Michael initially believed his condition was the result of his home environment, which resulted in Melissa entering a voluntary services plan with the Agency.[3]

---

[1]     Undesignated statutory references are to the Welfare and Institutions Code.

[2]     Hugo's parental rights were terminated at the same time as Melissa's, but he has not appealed.

[3]     Hugo was incarcerated at the time.

By the time L.R.'s petition was filed in October, Michael's medical team's opinion had changed and they contributed his failure to thrive to his complex congenital heart condition. Because of the domestic violence issues in the home, however, the Agency filed petitions on behalf of both L.R. and Michael.[4] The petitions were precipitated by altercations between Melissa and Louis, and between Hugo and Louis. At the time of these altercations, Melissa and L.R., but not Hugo, were living in Louis's home. In August, Hugo punched Louis, resulting in a black eye. In September, Hugo punched a window in L.R.'s bedroom after an argument with Melissa and Louis, and was arrested for vandalism. Later the same month, Louis reported that Melissa told him, in L.R.'s presence, that she wanted him dead. Thereafter, Louis obtained a restraining order against Melissa, requiring her to move out of the home.

All three, Melissa, Hugo and Louis, also accused each other of illicit drug use. Louis told the Agency that he had found a pipe that belonged to Melissa in his home and that she frequently invited people there to use methamphetamine. Hugo has a long history of criminal convictions for burglaries, domestic violence and drug possession. Melissa also has several criminal convictions for burglary and drug possession. At the detention hearing, the court found the Agency had made a prima facie showing and detained L.R. out of his mother's care.

---

[4]    Michael's dependency is not a subject of this appeal.

In advance of the jurisdiction hearing, L.R was placed in a foster home.[5] In its report for the hearing, the Agency continued to recommend out-of-home placement for the minor. Melissa acknowledged prior domestic violence with Hugo and submitted to a drug test, which was negative. Hugo had been taken into custody as a result of the vandalism arrest and parole violations, and was incarcerated. At the jurisdiction hearing, the court found the allegations in the petition true and set a further hearing for disposition, which Melissa contested.

In November, L.R. moved from foster care into the home of his maternal grandmother, Maria M., who also had custody of L.R.'s two older half-siblings. Before the disposition hearing, Melissa enrolled in a domestic violence program and parenting classes, and began individual counseling. The Agency reported that Hugo was serving three years in prison. After the December 10, 2013 contested disposition hearing the juvenile court declared L.R. a dependent, removed him from Melissa's custody and placed him with Maria. The court also ordered reunification services for both parents, visitation for Melissa after the completion of an additional negative drug test, and set the six-month review hearing for June 2014.

In the review period, Melissa found her own apartment and continued to participate, though sporadically, in reunification services. She missed several counseling sessions, and was frequently tardy and absent from her domestic violence and parenting programs. Melissa was also defensive at times about the Agency's involvement with her

---

[5]     Michael remained hospitalized throughout the dependency proceedings.

4

family, and service providers reported Melissa's attitude often stood in the way of progress. The Agency reported Melissa was consistent in her visitation with L.R., visiting twice each week, and that the visits were appropriate and loving.[6]

In its report for the six-month review hearing, the Agency recommended continued reunification services and visitation. The court adopted the recommendation. In the subsequent six-month review period, Melissa was authorized for weekly unsupervised visitation with L.R. Melissa's visitation remained consistent, and she continued to participate in reunification services. She completed her domestic violence program, but continued to be inconsistent in attending counseling. Melissa was also arrested for her involvement in the theft of two televisions from Wal-Mart with another individual. She was released without any charges filed, but the Agency was concerned with the people she was associating with and allowing to be present during her unsupervised visits with L.R.

The Agency's report for the 12-month review hearing recommended six additional months of reunification services. At the December 2014 review hearing the court adopted the Agency's recommendation and scheduled the 18-month review hearing for April 2015. In the third six-month review period, the Agency reported Melissa had met all of

---

[6]    Melissa also visited Michael twice a week and called the hospital regularly to check on him.

5

her reunification plan objectives, except those related to individual counseling. Melissa visited L.R. regularly and was appropriate during her supervised visitation.[7]

Maria and Louis reported to the family's social worker that Melissa was in a relationship with a man named Marco, who was the person she had been arrested with before the 12-month review hearing. Melissa denied the relationship, which the Agency's social worker found troubling. Before the 18-month review hearing, however, the Agency recommended an additional six months of reunification services and indicated that a 60-day trial visit would be appropriate "[i]f further down the line . . . there are no concerns and [Melissa] demonstrates a continual ability to keep her children safe." At the review hearing, L.R.'s counsel contested the Agency's recommendation to continue reunification efforts.

Before the May 6, 2015 settlement conference for the contested review hearing, the Agency changed its recommendation and asked the court to terminate reunification services for both parents and set a permanency planning hearing under section 366.26. The Agency reported that Melissa had continued to miss trainings related to Michael's medical care and that she had been arrested again with Marco for burglary. Melissa was also discharged from counseling for missing too many appointments. The social worker opined that Melissa had not shown she was capable of keeping the minors from being exposed to criminal activity and that it was unlikely this protective issue would be resolved within the next six months. The Agency also recommended that Melissa's visits

---

7     Melissa was inconsistent in her visitation with Michael during this review period and failed to complete trainings related to Michael's medical care.

revert to supervised. At the contested review hearing, the court found that Melissa had not made sufficient progress in her reunification efforts and that it was not in the minors' best interests to continue reunification services. The court terminated services, set the section 366.26 permanency planning hearing, and adopted the Agency's request to change Melissa's visitation back to supervised.

In its report for the permanency planning hearing, the Agency recommended the termination of parental rights for both parents and that the juvenile court order a permanent plan of adoption for L.R. The Agency reported Maria was committed to adopting L.R. and to providing him with a stable and secure home permanently. Melissa's visitation with L.R. decreased after the final review hearing. She visited him just three times between July and September 2015.[8]

The Agency's social worker also told Melissa to schedule visits at times when the social worker could observe so she could report on Melissa's relationship with L.R. Melissa did not comply, instead visiting L.R. sporadically and without providing notice to Maria or the social worker. Maria told the social worker Melissa's visits were generally positive and appropriate, although Melissa did become upset at a visit when L.R. called Maria "mom." The social worker deemed Melissa's visitation with L.R. inconsistent. She opined that although L.R. appeared "to enjoy the attention [he] receive[d] from [Melissa] when she decides to visit" he did not rely on her to meet his needs, but rather relied exclusively on Maria. She concluded that the parent-child

---

[8] Melissa told the social worker that she visited an additional time, but Maria denied that visit occurred.

relationship was not "so significant that it would outweigh [L.R.'s] overall safety or the benefits" offered by permanency.

At the initial section 366.26 hearing, Melissa and Hugo both contested the Agency's recommendation and the juvenile court set the matter for trial. In two supplemental reports before trial, the Agency noted Melissa's visitation decreased even further. By the time of the Agency's November 19, 2015 report, Melissa had not visited L.R. since the previous hearing in mid-October. In January, the Agency reported Melissa did not visit until December, and then saw L.R. only a few times. Maria reported that Melissa failed to show up for a visit after telling Maria she would come. At another visit, Melissa fell asleep a short time after arriving.[9] The Agency also reported that Maria described L.R. as generally disinterested in Melissa, and that during visits he was more focused on playing with his siblings, watching television or going outside than in interacting with Melissa. Maria also told the social worker that L.R. did not have any trouble separating from Melissa when visits ended.

The contested section 366.26 hearing took place on February 4, 2016. Just before the hearing, the Agency filed an additional addendum reporting that Melissa had been arrested, charged and sentenced for theft. On the date of the hearing, she was in custody at Las Colinas Detention Facility and was expected to be released later in the month.

---

[9] This visit occurred on December 3, 2015, two days after Melissa was told that Michael's health was worsening and the family should prepare to make end-of-life decisions. Thereafter, Melissa was permitted unsupervised visitation with Michael and the Agency recommended she spend as much time with him as possible and to arrange for visitation with L.R. at the hospital. By the time of section 366.26 hearing, Michael's dependency was proceeding on a track separate from L.R.

8

Also in the addendum, the Agency's social worker reported that L.R. had a strong attachment to Maria and referred to her as "mom."  At the hearing, the court took the Agency's reports into evidence and Melissa testified briefly, stating she loved L.R. and that they shared a strong bond.

After closing arguments by counsel, the court issued its order.  The court found by clear and convincing evidence that L.R. was both specifically and generally adoptable.  With respect to the applicability of the parent-child relationship exception to adoption, the juvenile court found that although Melissa's visitation was inconsistent recently, it would "err on the side of finding that [Melissa] maintained regular visitation and contact with [L.R.]."  With respect to the requirement that the minor "benefit from continuing the relationship with the mother," the court stated the issue was a "close" call and found L.R. "would benefit from continuing the relationship with his mom . . . ."

The court then turned to whether "there are compelling reasons that termination of this mother-child relationship would be detrimental to the child" and found that any harm to L.R. from terminating his relationship with Melissa was "far outweighed by the stability, comfort, love and support that" L.R. was receiving from Maria.  The court concluded Melissa had not shown the parent-child benefit to adoption applied and terminated her parental rights.

## DISCUSSION

Melissa's sole contention on appeal is that the juvenile court erred when it found the beneficial parent-child relationship exception to adoption inapplicable because the

court had already concluded she satisfied the two, exclusive statutory requirements of maintaining regular visitation and that L.R. would benefit from a continued relationship with her.

I

After reunification services are terminated, the focus of a dependency proceeding shifts from preserving the family to promoting the best interests of the child, including the child's interest in a stable, permanent placement that allows the caregiver to make a full emotional commitment to the child. (*In re Fernando M.* (2006) 138 Cal.App.4th 529, 534.) At the permanency planning hearing, the court has three options: (1) terminate parental rights and order adoption as the permanent plan; (2) appoint a legal guardian for the child; or (3) order the child placed in long-term foster care. (*Ibid.*)

"Adoption, where possible, is the permanent plan preferred by the Legislature." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 573 (*Autumn H.*).) If the court finds a child cannot be returned to his or her parent and is likely to be adopted if parental rights are terminated, it *must* select adoption as the permanent plan unless it finds termination of parental rights would be detrimental to the child under one of the specified statutory exceptions. (§ 366.26, subd. (c)(1)(A) & (B)(i)-(vi); *In re Erik P.* (2002) 104 Cal.App.4th 395, 401.) "The parent has the burden of establishing the existence of any circumstance that constitutes an exception to termination of parental rights." (*In re T.S.* (2009) 175 Cal.App.4th 1031, 1039.) Because a selection and implementation hearing occurs "after the court has repeatedly found the parent unable to meet the child's needs, it

10

is only in an extraordinary case that preservation of the parent's rights will prevail over the Legislature's preference for adoptive placement."  (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1350.)

Section 366.26, subdivision (c)(1)(B)(i), provides an exception to the adoption preference if termination of parental rights would be detrimental to the child because "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship."  Courts have interpreted the phrase " 'benefit from continuing the . . . relationship' " to refer to a parent-child relationship that "promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents.  In other words, the court balances the strength and quality of the natural parent[-]child relationship in a tenuous placement against the security and the sense of belonging a new family would confer.  If severing the natural parent[-]child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated."  (*Autumn H., supra*, 27 Cal.App.4th at p. 575; accord, *In re Jason J.* (2009) 175 Cal.App.4th 922, 936.)

The parent asserting the exception will not meet his or her burden by showing the existence of a "friendly and loving relationship," an emotional bond with the parent, or pleasant, even frequent, visits.  (*In re J.C.* (2014) 226 Cal.App.4th 503, 529; *In re C.F.* (2011) 193 Cal.App.4th 549, 555; *In re Beatrice M.* (1994) 29 Cal.App.4th 1411, 1418-

1419; *In re L.S.* (2014) 230 Cal.App.4th 1183, 1200 ["To avoid termination of parental rights, it is not enough to show that a parent-child bond exists"].) Rather, there must be a parental role in the child's life, resulting in a significant, positive emotional attachment from the child to parent that if severed would result in harm to the child. (*In re C.F., supra*, at p. 555; *In re Elizabeth M.* (1997) 52 Cal.App.4th 318, 324; *see also In re J.C., supra*, at p. 529 [observing that interaction between a natural parent and child will always confer some incidental benefit to the child and for the exception to apply, " 'a parental relationship is necessary' "].)

"We apply the substantial evidence standard of review to the factual issue of the existence of a beneficial parental relationship, and the abuse of discretion standard to the determination of whether there is a compelling reason for finding that termination would be detrimental to the child." (*In re Anthony B.* (2015) 239 Cal.App.4th 389, 395.) " 'We uphold judgments if they are correct for any reason, "regardless of the correctness of the grounds upon which the court reached its conclusion." [Citation.] "It is judicial action and not judicial reasoning which is the subject of review. . . ." ' " (*In re Jonathan B.* (1992) 5 Cal.App.4th 873, 876.)

## II

Melissa asserts reversal is warranted because the court added a third requirement to the beneficial parent-child relationship exception, not authorized by the statute, that she provide a " 'compelling reason' not to terminate parental rights." She contends this was error because the court had already found she satisfied the exception's two

requirements of maintaining regular visitation and showing a beneficial relationship with the minor. We disagree.

Although not listed as a third separate condition of the beneficial parent-child relationship exception, the statute explicitly requires a parent to show that termination of parental rights "would be detrimental to the child." (§ 366.26, subd. (c)(1)(B).) Under the provision, the court must determine if the circumstances supporting an exception to the adoption preference exist and, if they do, whether the "the child would be greatly harmed" if parental rights were terminated. (*Autumn H., supra*, 27 Cal.App.4th at p. 575; § 366.26, subd. (c)(1)(B).) If there is no showing by the parent that there would be detriment to the child if his or her parental rights were terminated, the Legislature's preference for adoption prevails. (*In re Jason J., supra*, 175 Cal.App.4th at p. 936.)

As discussed, the provision requires the court to "balance[] the strength and quality of the natural parent[-]child relationship . . . against the security and the sense of belonging a new family would confer." (*Autumn H., supra*, 27 Cal.App.4th at p. 575.) Said another way, the exception applies only if a parent shows that his or her relationship with the child " ' "promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents." ' " (*In re Anthony B., supra*, 239 Cal.App.4th at pp. 396-397.) Notwithstanding its initial statement that L.R. had a "beneficial" relationship with Melissa, the juvenile court found Melissa had not shown that terminating her relationship with L.R. would be detrimental to him. The court found there remained "a question as to whether or not [Melissa] would

13

be there for [L.R.] in the future" and that L.R. relied on Maria to meet all of his parental needs, and had done so for half of his life.

Contrary to Melissa's assertions, the record supported the juvenile court's ultimate conclusion that the exception did not apply because any detriment to L.R. that would result from severing Melissa's parental rights was far "outweighed by the stability, comfort, love and support" L.R. was receiving in Maria's home. Although Melissa's interactions with L.R. were generally pleasant and positive, the evidence showed she did not occupy a parental role in L.R.'s life. Indeed, by the time of the permanency planning hearing L.R. was disinterested in Melissa, Melissa's visitation had drastically decreased, and there was no evidence that L.R. was negatively impacted when his visits with Melissa ended.

These facts sufficiently supported the court's finding that Melissa had not shown the existence of a beneficial relationship and the court's conclusion that termination of Melissa's parental rights would not be detrimental to L.R. did not constitute an abuse of discretion.

## DISPOSITION

The order is affirmed.

McCONNELL, P. J.

WE CONCUR:

McDONALD, J.

O'ROURKE, J.